In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-3853

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ROD BLAGOJEVICH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 08 CR 888-1 — **James B. Zagel**, *Judge.*

ARGUED DECEMBER 13, 2013 — DECIDED JULY 21, 2015

Before EASTERBROOK, KANNE, and ROVNER, *Circuit Judges.*

EASTERBROOK, *Circuit Judge.* Rod Blagojevich was convicted of 18 crimes after two jury trials. The crimes include attempted extortion from campaign contributors, corrupt solicitation of funds, wire fraud, and lying to federal investigators. The first trial ended with a conviction on the false-statement count and a mistrial on the others after the jury could not agree. The second trial produced convictions on 17 additional counts. At the time of his arrest in December 2008,

Blagojevich was Governor of Illinois; the state legislature
impeached and removed him from office the next month.
The district court sentenced Blagojevich to 168 months' im-
prisonment on the counts that authorize 20-year maximum
terms, and lesser terms on all other counts. All sentences run
concurrently, so the total is 168 months. Because the charges
are complex, the trials long, and the issues numerous, an ef-
fort to relate many details would produce a book-length
opinion. Instead we present only the most important facts
and discuss only the parties' principal arguments. All else
has been considered but does not require discussion.

The events leading to Blagojevich's arrest began when
Barack Obama, then a Senator from Illinois, won the election
for President in November 2008. When Obama took office in
January 2009, Blagojevich would appoint his replacement, to
serve until the time set by a writ of election. See *Judge v.
Quinn*, 612 F.3d 537 (7th Cir. 2010). Before the 2008 election,
federal agents had been investigating Blagojevich and his
associates. Evidence from some of those associates had led to
warrants authorizing the interception of Blagojevich's phone
calls. (The validity of these warrants has not been contested
on this appeal.) Interceptions revealed that Blagojevich
viewed the opportunity to appoint a new Senator as a bo-
nanza.

Through intermediaries (his own and the President-
elect's), Blagojevich sought a favor from Sen. Obama in ex-
change for appointing Valerie Jarrett, who Blagojevich per-
ceived as the person Sen. Obama would like to have succeed
him. Blagojevich asked for an appointment to the Cabinet or
for the President-elect to persuade a foundation to hire him
at a substantial salary after his term as Governor ended, or

find someone to donate $10 million and up to a new "social-welfare" organization that he would control. The President-elect was not willing to make a deal, and Blagojevich would not appoint Jarrett without compensation, saying: "They're not willing to give me anything except appreciation. Fuck them."

Blagojevich then turned to supporters of Rep. Jesse Jackson, Jr., offering the appointment in exchange for a $1.5 million "campaign contribution." (We put "campaign contribution" in quotation marks because Blagojevich was serving his second term as Governor and had decided not to run for a third. A jury was entitled to conclude that the money was for his personal benefit rather than a campaign.) Blagojevich broke off negotiations after learning about the wiretaps, and he was arrested before he could negotiate with anyone else.

The indictment charged these negotiations as attempted extortion, in violation of 18 U.S.C. §§ 2 and 1951, plus corrupt solicitation of funds (18 U.S.C. §§ 371 and 666(a)(1)(B)) and wire fraud (18 U.S.C. §§ 1343 and 1346). The indictment also charged Blagojevich with other attempts to raise money in exchange for the performance of official acts, even though federal law forbids any payment (or agreement to pay), including a campaign contribution, in exchange for the performance of an official act. See *McCormick v. United States*, 500 U.S. 257 (1991). We give just two examples.

First, when lobbyists for Children's Memorial Hospital sought an increase in reimbursement rates for Medicaid patients, Blagojevich (through intermediaries) replied that he would approve an extra $8 to $10 million of reimbursement in exchange for a "campaign contribution" of $50,000. Blagojevich initially approved a rate increase but delayed and

then rescinded it when waiting for a contribution; he was arrested before any money changed hands.

Second, after the state legislature had approved an extension of a program that taxed casinos for the benefit of racetracks—see *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722 (7th Cir. 2011) (en banc); *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723 (7th Cir. 2014)—but before Blagojevich signed the bill, he attempted to ensure that John Johnston, who owned interests in two of the racetracks, fulfilled a $100,000 "campaign" pledge. Blagojevich had intermediaries inform Johnston that the bill would not be signed until the money arrived. Blagojevich was arrested before he signed the bill (and before Johnston signed a check).

These charges led to guilty verdicts at the second trial. The charge that produced a guilty verdict at the first trial was that Blagojevich had lied to the FBI in 2005, violating 18 U.S.C. §1001. Investigations of Blagojevich's associates began shortly after he took office as Governor in 2003, and by 2005 the FBI wanted to ask Blagojevich what he knew about his associates' conduct. He agreed to an interview in his lawyer's office. Agents asked whether Blagojevich took contributions into account when approving state contracts or making appointments. He replied "that he does not track who contributes to him and does not want to know and does not keep track of how much they contribute to him." So an agent testified, relying on his notes. At Blagojevich's insistence, the interview was not recorded, but a jury could find the agent's testimony accurate. The jury also concluded that this answer was knowingly false, because in 2005 and earlier Blagojevich regularly found out who contributed how much. (The jury

was told to assess the honesty of this answer based solely on how Blagojevich had conducted himself from 2003 through 2005.)

Blagojevich now asks us to hold that the evidence is insufficient to convict him on any count. The argument is frivolous. The evidence, much of it from Blagojevich's own mouth, is overwhelming. To the extent there are factual disputes, the jury was entitled to credit the prosecution's evidence and to find that Blagojevich acted with the knowledge required for conviction.

But a problem in the way the instructions told the jury to consider the evidence requires us to vacate the convictions on counts that concern Blagojevich's proposal to appoint Valerie Jarrett to the Senate in exchange for an appointment to the Cabinet. A jury could have found that Blagojevich asked the President-elect for a private-sector job, or for funds that he could control, but the instructions permitted the jury to convict even if it found that his only request of Sen. Obama was for a position in the Cabinet. The instructions treated all proposals alike. We conclude, however, that they are legally different: a proposal to trade one public act for another, a form of logrolling, is fundamentally unlike the swap of an official act for a private payment.

Because the instructions do not enable us to be sure that the jury found that Blagojevich offered to trade the appointment for a private salary after leaving the Governorship, these convictions cannot stand. Compare *Yates v. United States*, 354 U.S. 298 (1957), and *United States v. Rivera Borrero*, 771 F.3d 973 (7th Cir. 2014), with *Griffin v. United States*, 502 U.S. 46 (1991). (Perhaps because the jury deadlocked at the first trial, the United States does not seriously contend

that any error was harmless; a one-line statement in the brief differs from an argument. Cf. *Hedgpeth v. Pulido*, 555 U.S. 57, 60–62 (2008) (an error of this kind is not "structural").)

*McCormick* describes the offense as a *quid pro quo*: a public official performs an official act (or promises to do so) in exchange for a private benefit, such as money. See also *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 404–05 (1999); *United States v. McDonnell*, 2015 U.S. App. LEXIS 11889 (4th Cir. July 10, 2015). A political logroll, by contrast, is the swap of one official act for another. Representative A agrees with Representative B to vote for milk price supports, if B agrees to vote for tighter controls on air pollution. A President appoints C as an ambassador, which Senator D asked the President to do, in exchange for D's promise to vote to confirm E as a member of the National Labor Relations Board. Governance would hardly be possible without these accommodations, which allow each public official to achieve more of his principal objective while surrendering something about which he cares less, but the other politician cares more strongly.

A proposal to appoint a particular person to one office (say, the Cabinet) in exchange for someone else's promise to appoint a different person to a different office (say, the Senate), is a common exercise in logrolling. We asked the prosecutor at oral argument if, before this case, logrolling had been the basis of a criminal conviction in the history of the United States. Counsel was unaware of any earlier conviction for an exchange of political favors. Our own research did not turn one up. It would be more than a little surprising to Members of Congress if the judiciary found in the Hobbs

Act, or the mail fraud statute, a rule making everyday politics criminal.

Let's work this through statute by statute. Section 1951, the Hobbs Act, which underlies Counts 21 and 22, forbids interference with commerce by robbery or extortion. Blagojevich did not rob anyone, and extortion, a defined term, "means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right" (§1951(b)(2)). The indictment charged Blagojevich with the "color of official right" version of extortion, but none of the evidence suggests that Blagojevich claimed to have an "official right" to a job in the Cabinet. He did have an "official right" to appoint a new Senator, but unless a position in the Cabinet is "property" from the President's perspective, then seeking it does not amount to extortion. Yet a political office belongs to the people, not to the incumbent (or to someone hankering after the position). *Cleveland v. United States*, 531 U.S. 12 (2000), holds that state and municipal licenses, and similar documents, are not "property" in the hands of a public agency. That's equally true of public positions. The President-elect did not have a property interest in any Cabinet job, so an attempt to get him to appoint a particular person to the Cabinet is not an attempt to secure "property" from the President (or the citizenry at large).

*Sekhar v. United States*, 133 S. Ct. 2720 (2013), shows that the phrase "obtaining of property" in the Hobbs Act must not be extended just to penalize shady dealings. *Sekhar* holds that a recommendation about investments is not "property" under §1951(b)(2) for two principal reasons: first, in the long history of extortion law it had never before been so under-

stood (similarly, political logrolling has never before been condemned as extortion); second, the making of a recommendation is not transferrable. The Court restricted "property" to what one owner can transfer to another. By that standard a job in the Cabinet (or any other public job) is not "property" from the employer's perspective. It is not owned by the person with appointing power, and it cannot be deeded over. The position may be *filled* by different people, but the position itself is not a transferrable property interest. A position is "held" or "occupied" but not "obtained," and under *Sekhar* something that cannot be "obtained" also cannot be the subject of extortion.

Section 666, the basis (through a conspiracy charge) of Count 23, forbids theft or bribery in publicly funded programs (of which the State of Illinois is one). Count 23 relies on §666(a)(1)(B), which makes it a crime for an agent of a covered organization to solicit "corruptly … anything of value" in connection with a transaction worth $5,000 or more. "Corruptly" refers to the recipient's state of mind and indicates that he understands the payment as a bribe or gratuity. *United States v. Hawkins*, 777 F.3d 880, 882 (7th Cir. 2015). It would not be plausible to describe a political trade of favors as an offer or attempt to bribe the other side. What is more, §666(c) provides that the section as a whole does not apply "to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." Compensation for a job by someone other than a ghost worker is a "bona fide salary"—and, as we've pointed out, the "usual course of business" in politics includes logrolling.

The indictment also charged Blagojevich with wire fraud, in violation of 18 U.S.C. §1343. That the negotiations used the phone system is indisputable, but where's the fraud? Blagojevich did not try to deceive Sen. Obama. The prosecutor contended that Blagojevich deprived the public of its intangible right to his honest services, which 18 U.S.C. §1346 defines as a form of fraud. To call this an honest-services fraud supposes an extreme version of truth in politics, in which a politician commits a felony unless the ostensible reason for an official act also is the real one. So if a Governor appoints someone to a public commission and proclaims the appointee "the best person for the job," while the real reason is that some state legislator had asked for a friend's appointment as a favor, then the Governor has committed wire fraud because the Governor does not actually believe that the appointee is the best person for the job. That's not a plausible understanding of §1346, even if (as is unlikely) it would be valid under the First Amendment as a criminal penalty for misleading political speech. And no matter what one makes of the subject, the holding of *Skilling v. United States*, 561 U.S. 358 (2010), prevents resort to §1346 to penalize political horse-trading. *Skilling* holds that only bribery and kickbacks violate §1346. So unless political logrolling is a form of bribery, which it is not, §1346 drops out.

The prosecutor insists, however, that Blagojevich's situation is different and uncommon because he sought a post in the Cabinet for himself. It isn't clear to us that this is unusual. The current Secretary of State was appointed to that position from a seat in the Senate, and it wouldn't surprise us if this happened at least in part because he had performed a political service for the President. Ambassadors, too, come

from the House or Senate (or from state politics) as part of political deals.

Some historians say that this is how Earl Warren came to be Chief Justice of the United States: he delivered the California delegation at the 1952 Republican convention to Eisenhower (rather than Senator Taft) in exchange for a commitment to appoint him to the next vacancy on the Supreme Court. See, e.g., Morton J. Horwitz, *The Warren Court and the Pursuit of Justice* 7 (1998); Arthur Paulson, *Realignment and Party Revival: Understanding American Electoral Politics at the Turn of the Twenty-First Century* 86 (2000). Whether this account is correct is debatable, see Jim Newton, *Justice for All: Earl Warren and the Nation He Made* 6–11 (2006), and Chief Justice Warren himself denied that a deal had been made (though perhaps a political debt had been incurred), *The Memoirs of Earl Warren* 250–61 (1977). If the prosecutor is right, and a swap of political favors involving a job for one of the politicians is a felony, then if the standard account is true both the President of the United States and the Chief Justice of the United States should have gone to prison. Yet although historians and political scientists have debated whether this deal was made, or whether if made was ethical (or politically unwise), no one to our knowledge has suggested that it violated the statutes involved in this case. (Whether it might have violated 18 U.S.C. §599, and whether that statute is compatible with the First Amendment, are issues we do not address.)

Let us go through the three statutes again. *McCormick* holds that a politician's offer to perform a valuable service can violate §1951 as extortion if it involves a *quid pro quo*: a public act in exchange for a valuable return promise. We've

already explained, however, why logrolling does not violate §1951. The exclusion in §666(c) for bona fide employment also applies no matter who gets the job. Who would get the public job does not matter to §1346 either. Indeed, the analysis in *United States v. Thompson*, 484 F.3d 877 (7th Cir. 2007), applies to Blagojevich too. *Thompson* reversed convictions under §666 and §1346 that had been obtained on a theory that a public employee's interest in keeping her job meant that she violated federal law if she performed any aspect of her job in ways that she knew she shouldn't. (The asserted error in *Thompson* was an incorrect ranking of bidders for a travel-services contract.) *Thompson* holds, among other things, that the interest in receiving a salary from a public job is not a form of private benefit for the purpose of federal criminal statutes.

Put to one side for a moment the fact that a position in the Cabinet carries a salary. Suppose that Blagojevich had asked, instead, that Sen. Obama commit himself to supporting a program to build new bridges and highways in Illinois as soon as he became President. Many politicians believe that public-works projects promote their re-election. If the prosecutor is right that a public job counts as a private benefit, then the benefit to a politician from improved chances of election to a paying job such as Governor—or a better prospect of a lucrative career as a lobbyist after leaving office—also would be a private benefit, and we would be back to the proposition that all logrolling is criminal. Even a politician who asks another politician for favors only because he sincerely believes that these favors assist his constituents could be condemned as a felon, because grateful constituents make their gratitude known by votes or post-office employment.

What we have said so far requires the reversal of the convictions on Counts 5, 6, 21, 22, and 23, though the prosecutor is free to try again without reliance on Blagojevich's quest for a position in the Cabinet. (The evidence that Blagojevich sought money in exchange for appointing Valerie Jarrett to the Senate is sufficient to convict, so there is no double-jeopardy obstacle to retrial. See *Burks v. United States*, 437 U.S. 1 (1978).) Because many other convictions remain and the district judge imposed concurrent sentences, the prosecutor may think retrial unnecessary—but the judge may have considered the sought-after Cabinet appointment in determining the length of the sentence, so we remand for resentencing across the board. (The concluding part of this opinion discusses some other sentencing issues.)

With the exception of the proposed Cabinet deal, the jury instructions are unexceptionable. They track *McCormick*. Much of Blagojevich's appellate presentation assumes that extortion can violate the Hobbs Act only if a *quid pro quo* is demanded explicitly, but the statute does not have a magic-words requirement. Few politicians say, on or off the record, "I will exchange official act X for payment Y." Similarly persons who conspire to rob banks or distribute drugs do not propose or sign contracts in the statutory language. "Nudge, nudge, wink, wink, you know what I mean" can amount to extortion under the Hobbs Act, just as it can furnish the gist of a Monty Python sketch.

Blagojevich contends that he was entitled to an instruction that, if he believed in good faith that his conduct was lawful, then he must be acquitted. That is not so; an open-ended "good faith" defense would be either a mistake-of-law defense in disguise or an advice-of-counsel defense

without demonstrating advice of counsel. This circuit's pattern jury instructions call for a good-faith instruction only when the statute contains a term such as "willful" that (as understood for that particular statute) makes knowledge of the law essential. *Pattern Criminal Jury Instructions of the Seventh Circuit* §6.10 (2012 revision).

Suppose Blagojevich believed that winks and nudges avoid the *McCormick* standard. That would be legally wrong, and the fact that he *believed* it would not support acquittal unless mistake of law is a defense. Blagojevich does not argue that knowledge of the law is essential to conviction under §666 or §1951, so there's no basis for a good-faith instruction. See *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008); *United States v. Wheeler*, 540 F.3d 683, 689–90 (7th Cir. 2008). It is enough for the instruction to cover the mental elements required by each statute. That a given defendant wants to apply the phrase "good faith" to the lack of essential knowledge or intent does not imply the need for a separate instruction; a jury's task is hard enough as it is without using multiple phrases to cover the same subject. These instructions defined the statutes' *mens rea* elements correctly; no more was required.

The argument for a good-faith instruction relies principally on *Cheek v. United States*, 498 U.S. 192 (1991), but that's a different kettle of fish. The Justices read the word "willfully" in a particular tax law to require proof that the accused knew the law, which the Justices saw as technical and beyond the ken of many taxpayers. The word "willfully" does not appear in any of the statutes that Blagojevich was charged with violating. Anyway, he does not deny knowing the rule of *McCormick*, under which the exchange of an offi-

cial act for a private benefit is illegal, so *Cheek* would not help him even if it applied. The "good faith" argument is just a stalking horse for the contention that the *quid pro quo* must be stated explicitly and cannot be implied from hints and nudges; as we have rejected that contention directly, it cannot be resuscitated in the form of a "good faith" instruction untethered from statutory language.

The district judge *did* give a good-faith instruction limited to the wire-fraud counts, which have an intent requirement within the scope of §6.10. The judge used the language of §6.10, as modified to fit the specific charges, and added one sentence at the end. Here's how the instruction wrapped up:

> The burden is not on the defendant to prove his good faith; rather, the government must prove beyond a reasonable doubt that the defendant acted with the requisite intent. The government is not required to prove that the defendant knew his acts were unlawful.

Blagojevich contends that this instruction's final sentence is improper. To the contrary, the sentence just reminds the jury that mistake of law is not a defense. The wire-fraud statute requires a specific intent to defraud but *not* wilfulness or any other proxy for knowledge of the law. To the extent that Blagojevich may think that a need to show intent to defraud is the same as a need to show knowledge about what the law requires, he misreads *United States v. LeDonne*, 21 F.3d 1418, 1430 (7th Cir. 1994). See *Barlow v. United States*, 32 U.S. (7 Pet.) 404, 410–11 (1833) (distinguishing these two subjects). The district judge was concerned that Blagojevich had been trying to argue mistake-of-law indirectly even though none of the statutes requires legal knowledge; under the circumstances, it was not an abuse of discretion to add a caution to

the instructions. Cf. *United States v. Curtis*, 781 F.3d 904, 907 (7th Cir. 2015) (an instruction is proper unless "as a whole [it] misled the jury as to the applicable law").

We now take up challenges to the admission and exclusion of evidence. Each trial lasted about a month, so there were plenty of evidentiary rulings. On the whole, the district judge allowed the defense considerable latitude, but Blagojevich can't complain about the rulings in his favor. He does complain about several that went the prosecution's way, and we discuss three of them.

The first concerns a ruling that excluded wiretap transcripts showing that at the same time Blagojevich was asking the President-elect for something in exchange for appointing Valerie Jarrett to the Senate, he was asking Michael Madigan (Speaker of the state's House of Representatives) to support his political program in exchange for appointing Lisa Madigan, Michael's daughter, to the Senate. Blagojevich's lawyers contended that his objective all along was to appoint Lisa Madigan, then (and now) the Attorney General of Illinois. The district judge did not allow this wiretap evidence, ruling that it would divert attention from the indictment's charges. A bank robber cannot show that on many other occasions he entered a bank without pulling a gun on a teller, nor can a teller charged with embezzlement show how often he made correct entries in the books.

As we've mentioned, the district court gave the defense a long leash, and the judge was entitled to conclude that evidence about negotiations with Speaker Madigan would sidetrack this trial. See Fed. R. Evid. 403. The Madigan conversations could have shown that Blagojevich was negotiating with many people for the best deal; they would not have

shown that any of his requests to the President-elect or Rep. Jackson was lawful. The judge did permit Blagojevich to testify that he had planned to appoint Lisa Madigan all along and that he was deceiving rather than extorting the President-elect. (In the end, however, he appointed Roland Burris, not Lisa Madigan.) Some transcripts admitted for other purposes also contained Lisa Madigan's name.

Come the closing argument, the prosecutor used the judge's ruling to advantage, stating:

> And the Lisa Madigan deal, you'll have the calls, November 1st through November 13th. Go back and look at the calls and see how many times Lisa Madigan is actually mentioned … . That's one, and two, how often is she mentioned in a way that she is not a stalking horse, and you're not going to find it. She was a stalking horse.

Blagojevich contends that this argument violated the Due Process Clause by so misleading the jury that it could no longer think rationally about his guilt. See *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

Having persuaded the judge to keep most Madigan transcripts out of evidence, the prosecutor should not have argued that the record contains very few references to her. The paucity of references was a result of the prosecutor's strategy, not the defense's strategy or a shortage of references in the recordings. But *Darden* sets a very high bar for a due-process challenge to a prosecutor's closing argument. In the main, the right response is argument from the defense or correction from the judge, not reversal on appeal. Especially not when the trial lasted five weeks and the prosecutorial comment lasted a few seconds. It is extraordinarily unlikely that this comment, about what is (as we have mentioned) a

collateral if not an irrelevant matter, could have affected the jury's evaluation of the contention that Blagojevich violated the Hobbs Act and §666 by asking the President-elect or Rep. Jackson for cash (or a lucrative private-sector job) in exchange for Blagojevich's appointment of the new Senator.

The second evidentiary subject concerns a recording of a conversation between John Harris, Blagojevich's chief of staff, and William Quinlan, his general counsel. Harris testified; Quinlan did not. During the direct examination of Harris, the prosecutor introduced a recording of a call between Harris and Quinlan, during which Harris asked why Blagojevich had not yet signed the bill extending the racetrack subsidy, and Quinlan replied: "Ah, let's just say, it is what you think." The district judge admitted the statement "not for [its] truth but for the effect [it] had on … Harris and the decisions that he ma[de] as a result of th[e] conversation." The Federal Rules of Evidence prohibit hearsay, which is an out of court statement used to prove the truth of the matter stated, see Fed. R. Evid. 801(c)(2), but with the judge's limitation Quinlan's statement was not hearsay. The prosecutor then asked Harris what he understood (he answered that Blagojevich "was holding the bill because he wanted to talk to [people] about getting campaign contributions from the racetrack owners before he signed") and what actions he took as a result. No problems so far.

Once again, though, a problem cropped up in the closing argument. The prosecutor said this:

> John Harris talks to the defendant, and you got that call at Tab 54, and he asks him what to do about the racing bill because what he knows is he has approved it, there's a green light. The defendant tells him in that call "I'm sitting on the bill." He already had a hold on that bill as of noon of November the 26th.

What John Harris told you is that the excuse that he got from the defendant on that call made no sense to him, it was a red flag. He said something to him like "I want to see how it all fits together." What Harris told you there is there was nothing to see on this bill about how it fit in with anything else that was pending at that time. And so what John Harris says, "I bet he's holding this up for a campaign contribution."

John Harris goes to Bill Quinlan, he tells him what his concern is, and he asks him to talk to the defendant and find out if that's what he's doing. *And you got the call at Tab 56 where Bill Quinlan confirms that's exactly what the defendant is doing.* And what John Harris testified is once he knew that, he stepped out, and he left it to the defendant and Lon Monk [a lobbyist; formerly Blagojevich's chief of staff] to figure out. He knew he wasn't going to be able to do anything once he had a hold on that bill waiting for a campaign contribution.

The language we have italicized is the problem. It takes Quinlan's statement as the proposition that Blagojevich was waiting for money. That's a hearsay use. The only proper use of the statement was for the effect it had on Harris.

Perhaps one could rescue the argument by saying that the italicized sentence is just shorthand for the permitted use of Quinlan's recorded words: Harris *understood* them as confirming his belief that Blagojevich was holding the bill in order to extract money from racetrack owners. Jurors might have been hard pressed to tell the difference between "Quinlan confirmed X" and "Harris understood Quinlan to confirm X." This may reflect adversely on the hearsay doctrine; jurors do not draw subtle distinctions just because they have been part of the common law since the eighteenth century. At all events, "subtle" is the important word. Given the duration of this trial and the power of the evidence, the fact that a prosecutor says "Quinlan confirmed X" when he should have said "Harris understood Quinlan to have con-

firmed X" cannot have affected the outcome. The judge himself seems to have missed the distinction, despite his earlier ruling. The likelihood of prejudice from this misstatement is minute, and without prejudice there's no basis for a reversal. See *United States v. Richards*, 719 F.3d 746, 764 (7th Cir. 2013).

Now for the third evidentiary issue, and the last we discuss. During trial, the judge admitted evidence that, before his arrest, Blagojevich had retained the services of lawyers with experience in criminal defense. Blagojevich's appellate brief contends that the only function of this evidence was to imply consciousness of guilt. The prosecutor replies, however, that this evidence served a different function: to address what seemed to be a developing advice-of-counsel defense. To this Blagojevich rejoins that he never raised such a defense, so the evidence was both irrelevant and prejudicial.

"Advice of counsel is not a free-standing defense, though a lawyer's fully informed opinion that certain conduct is lawful (followed by conduct strictly in compliance with that opinion) can negate the mental state required for some crimes, including fraud." *United States v. Roti*, 484 F.3d 934, 935 (7th Cir. 2007). Blagojevich did not mount an advice-of-counsel defense. He did not fully reveal his actions to any lawyer, did not receive an opinion that the acts were lawful, and did not comport himself strictly in compliance with any such opinion. But he hinted in that direction. Here is some of his testimony:

- "I immediately had Mary [Stewart] find Bill Quinlan for me so that I could talk to Bill Quinlan my lawyer, the governor's lawyer, about what do I do about this, how do I handle this, because I wanted to be very careful that I don't get caught up in some-

thing that I'm not aware of that isn't—that is poten-tially wrong and could very well be wrong." Tr. 3809.

- "And then I was reconstructing for Bill Quinlan, my lawyer, basically, you know, spilling whatever I knew, whatever was coming into my mind to him about that call, about that conversation about the fundraising requests from Patrick Magoon [the President of Children's Memorial Hospital] in con-nection with Dusty Baker [a former manager of the Chicago Cubs who was lobbying on Magoon's be-half] calling me. And so I was relating this to Bill Quinlan … because I was basically trying to find out from Quinlan do you think I said something wrong? Could I have done—could I have stumbled into crossing a line of some sort?" Tr. 4078.

- "Q: Why were you telling Bill Quinlan that? A: Be-cause Bill Quinlan's my general counsel, he's my lawyer and he was in many ways, you know, a—he was in many ways—you know, he—I talked to him about everything that was remotely connected to anything that was on legal issues or pending inves-tigation and all the rest because I wanted to be care-ful not to do anything wrong." Tr. 4079.

- "Bill Quinlan … was my general counsel, and there was nothing I would do of any magnitude that I felt I needed to discuss with my general counsel, my lawyer Bill Quinlan." Tr. 4092.

- "Q: Did you also have several conversations with Bill Quinlan about the Senate seat? A: Yes. I talked

to Bill Quinlan about it constantly, continuously, almost every day. Almost every day. Q: Did you have conversations with Bill Quinlan about [establishing] a 501(c)(4) [social-welfare organization] in relation to the Senate seat? A: I had several conversations with Bill Quinlan about a 501(c)(4) in relation to the Senate seat." Tr. 4112.

The prosecutor objected to all of this testimony, observing that Blagojevich had not tried to meet the requirements of an advice-of-counsel defense, but the judge allowed the testimony (this is one of the many examples of resolving debatable questions in the defense's favor). Having asserted that he consulted with counsel, Blagojevich opened the door to evidence that he had other lawyers too yet was keeping mum about what they told him. That's an appropriate topic for evidence and for comment during closing argument.

Sentencing is the only other subject that requires discussion. The district judge concluded that the Sentencing Guidelines recommend a range of 360 months to life imprisonment for Blagojevich's offenses, and the actual sentence is 168 months. Instead of expressing relief, Blagojevich maintains that the sentence is too high because the range was too high. The judge erred in two respects, Blagojevich contends: first, the judge included as loss the $1.5 million that, he found, Blagojevich had asked Rep. Jackson's supporters to supply. See U.S.S.G. §2C1.1(b)(2). He calls this finding "speculative." The judge also added four levels under U.S.S.G. §3B1.1(a) after finding that Blagojevich was the leader or organizer of criminal activity that included five or more participants or was "otherwise extensive". Blagojevich

contends that the many persons he consulted or used as in-
termediaries should not count.

The district judge did not err in either respect. The $1.5
million figure did not come out of a hat; it was a number
discussed in the recordings. That nothing came of these
overtures does not affect the calculation of loss under
§2C1.1(b)(2), because it is an amount Blagojevich intended to
receive from criminal conduct even though not a sum any-
one else turned out to be willing (or able) to pay. As for the
leadership enhancement for an "otherwise extensive" organ-
ization: This applies whether or not the defendant's subor-
dinates and associates are criminally culpable. U.S.S.G.
§3B1.1 Application Note 3. The numbers involved here sub-
stantially exceed five and qualify as "otherwise extensive."

Any error in the Guidelines calculation went in Blago-
jevich's favor. After calculating the 360-to-life range, the
judge concluded that it is too high and began making reduc-
tions, producing a range of 151 to 188 months. For example,
the judge gave Blagojevich a two-level reduction for accept-
ing responsibility, see U.S.S.G. §3E1.1, and took off two more
for good measure, even though he pleaded not guilty, de-
nied culpability at two lengthy trials, and even now con-
tends that the evidence is insufficient on *every* count and that
he should have been acquitted across the board. That's the
antithesis of accepting responsibility. The judge reduced the
range further by deciding not to count all of the $1.5 million
as loss, even though he had decided earlier that it is the right
figure. The prosecutor has not filed a cross-appeal in quest of
a higher sentence but is entitled to defend the actual sen-
tence of 168 months (and to ask for its re-imposition on re-
mand) without needing to file an appeal. Removing the con-

victions on the Cabinet counts does not affect the range cal-
culated under the Guidelines. It is not possible to call 168
months unlawfully high for Blagojevich's crimes, but the
district judge should consider on remand whether it is the
most appropriate sentence.

The convictions on Counts 5, 6, 21, 22, and 23 are vacat-
ed; the remaining convictions are affirmed. The sentence is
vacated, and the case is remanded for retrial on the vacated
counts. Circuit Rule 36 will not apply. If the prosecutor elects
to drop these charges, then the district court should proceed
directly to resentencing. Because we have affirmed the con-
victions on most counts and concluded that the advisory
sentencing range lies above 168 months, Blagojevich is not
entitled to be released pending these further proceedings.