In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-2526

EMPRESS CASINO JOLIET CORP., et al.,

*Plaintiffs-Appellees,*

*v.*

BALMORAL RACING CLUB, INC. and MAYWOOD PARK TROTTING
ASSOCIATION, INC.,

*Defendants-Appellants.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 09 C 3585 — **Matthew F. Kennelly**, *Judge*.

ARGUED JANUARY 12, 2016 — DECIDED AUGUST 2, 2016

Before WOOD, *Chief Judge*, and WILLIAMS and HAMILTON,
*Circuit Judges*.

HAMILTON, *Circuit Judge*. This appeal pits casinos against
racetracks in our circuit's latest encounter with the Blago-
jevich corruption scandal in Illinois. In 2008, John Johnston, a
horse racetrack executive, promised a $100,000 campaign con-
tribution to then-Governor Rod Blagojevich in exchange for
his signature on a bill to tax the largest casinos in Illinois for

the direct benefit of the Illinois horseracing industry. After Blagojevich's corruption came to light, the casinos sued the racetracks, alleging a conspiracy to violate the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and state-law claims for civil conspiracy and unjust enrichment. A jury awarded the casinos $25,940,000 in damages, which was trebled under RICO to $77,820,000. The racetracks argue on appeal that plaintiffs failed to prove a RICO conspiracy, that the district court erred by allowing plaintiffs to add the state-law claims, and that other asserted errors warrant a new trial.

We affirm the district court in all respects except one: the jury did not have legally sufficient evidence to support a verdict finding a conspiracy to engage in a "pattern" of racketeering activity, as required for liability on a RICO conspiracy theory. The casinos are still entitled to the $25,940,000 in damages on the state-law claims, but not to have those damages trebled under RICO.

We first review the factual and procedural background of this case. Second, we examine the sufficiency of the evidence of an illegal agreement and a pattern of racketeering activity. Third, we address the late amendment to the complaint to add the state-law claims. Finally, we examine several claims of trial error.

I.   *Factual and Procedural Background*

After Illinois legalized riverboat casino gambling in the early 1990s, see 230 ILCS 10/3, the Illinois horseracing industry wanted to make up for the business it claimed to have lost as a result. It turned to state government for help. In 2006, Illinois enacted H.B. 1918, which we refer to as the 2006 Act. It

required the four largest casinos in the state (casinos earning more than $2 million in adjusted gross receipts in 2004) to pay three percent of their daily adjusted gross receipts into a trust fund for the benefit of the horseracing industry. 2006 Ill. Legis. Serv. P.A. 94-804 (H.B. 1918). The 2006 Act contained a "sunset" provision to expire at the end of May 2008.

This appeal focuses on the racetracks' effort to renew the law in what we call the 2008 Act. The Johnston family owns several businesses, including shares in the racetrack defendants Maywood Park Trotting Association, Inc. and Balmoral Racing Club, Inc. John Johnston was an executive at the two defendant racetracks and one of the beneficiaries of the family trust that partially owned the tracks. In May 2007, Johnston hired Alonzo Monk as a lobbyist for the racetracks. Monk had been a longtime aide to Governor Rod Blagojevich and had served as Blagojevich's chief of staff and campaign manager before starting his own lobbying and consulting business.

Monk worked to renew the 2006 Act's horseracing subsidy that was to sunset. The casinos allege that this effort involved a *quid pro quo* agreement between Blagojevich and Johnston to trade a $100,000 campaign contribution for the governor's signature on the 2008 bill. The primary evidence at issue in this appeal is a series of meetings and phone calls among Johnston, Monk, and Blagojevich. The federal government recorded many of the calls and conversations during a broader criminal investigation of Blagojevich. We lay out the details below in our discussion of the sufficiency of evidence. In broad terms, in April 2008, Johnston met with Blagojevich at the governor's campaign fundraising office. The two discussed the expiration of the 2006 Act. At the end of the meet-

ing Blagojevich brought up Johnston's support for his campaign. There is no evidence that Johnston agreed to make a contribution at that time, and no payment was made then. That meeting did not succeed in securing the 2006 Act's renewal. At the end of May 2008, the 2006 Act expired.

In August or September 2008, Johnston agreed to make a $100,000 contribution to Blagojevich's campaign, but he did not pay immediately. A number of conversations followed involving Monk, Johnston, Governor Blagojevich, and his brother Rob.

 On November 20, 2008, the legislature passed the 2008 Act, which was presented to Governor Blagojevich on November 24 for his signature. The governor did not sign immediately, but there followed a number of conversations among Blagojevich, Monk, and Johnston. As we explain below, on December 3, 2008, according to Monk's testimony, the *quid pro quo* agreement was pinned down and Johnston committed to make the contribution in return for the governor's signature.

Blagojevich was arrested on December 9. On December 15, while on pretrial release and before he was impeached and removed from office, he signed the 2008 Act. Johnston never made the promised contribution. Monk pled guilty to conspiring with Blagojevich to solicit a bribe from Johnston. Johnston received immunity from prosecution and testified before a grand jury and at Blagojevich's criminal trials.

The casinos subject to the tax sued Johnston, Balmoral, Maywood, and other defendants no longer involved in the case (for convenience we refer to defendant-appellants as "the racetracks"). The casinos alleged that the racetracks had violated 18 U.S.C. § 1962(d) by conspiring to violate RICO. In

2013, the district court granted summary judgment in favor of the racetracks, concluding that the casinos had not offered evidence sufficient to show that the racetracks' alleged bribes proximately caused the casinos' losses pursuant to the 2006 and 2008 tax legislation. *Empress Casino Joliet Corp. v. Blagojevich*, No. 09 C 3585, 2013 WL 4478741 (N.D. Ill. Aug. 19, 2013).

We affirmed summary judgment regarding the 2006 Act but reversed regarding the 2008 Act. *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 728 (7th Cir. 2014) (*Empress Casino III*).[1] We held that the racetracks had not presented evidence sufficient to survive summary judgment that campaign contributions to Blagojevich had proximately caused the legislature's passage of the 2006 Act or that the racetracks bribed Blagojevich to sign the 2006 Act. *Id.* at 729, 731. But on the 2008 Act, we held there was sufficient evidence that the racetracks formed a *quid pro quo* agreement with Blagojevich that caused him to sign the Act. *Id.* at 731–33. In allowing claims on the 2008 Act to go forward, we stressed that the only RICO element we were deciding was the issue of proximate cause, noting in particular that the pattern requirement remained open. *Id.* at 734–35.

---

[1] See also *Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519 (7th Cir. 2011) (*Empress Casino I*) (legislative immunity for Blagojevich), opinion vacated in part, 649 F.3d 799 (7th Cir. 2011), and *Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, 651 F.3d 722 (7th Cir. 2011) (en banc) (*Empress Casino II*) (Tax Injunction Act barred constructive trust claim). The casinos have also unsuccessfully challenged the constitutionality of the 2006 and 2008 Acts in state court. *Empress Casino Joliet Corp. v. Giannoulias*, 896 N.E.2d 277 (Ill. 2008); *Empress Casino Joliet Corp. v. Giannoulias*, 942 N.E.2d 783 (Ill. App. 2011).

After we reversed summary judgment on the 2008 Act, the district court allowed plaintiffs to amend their complaint, over defendants' objections, to add state-law claims for civil conspiracy and unjust enrichment. The court also denied defendants' motion for summary judgment focusing on the RICO pattern requirement.[2]

The jury found for the casinos on all counts and awarded them $25,940,000 in damages, which was trebled under RICO's civil damages provision to $77,820,000. See 18 U.S.C. § 1964(c). This appeal followed, challenging the sufficiency of the evidence supporting the RICO count and the district court's grant of leave to amend the complaint, and arguing that various alleged errors warrant a new trial.[3]

II. *Sufficiency of the Evidence*

The racetracks appeal the district court's denial of their Rule 50(b) renewed motion for judgment as a matter of law. They argue that the evidence presented at trial cannot support several aspects of the verdict that they engaged in a racketeering conspiracy in violation of 18 U.S.C. § 1962(d). We review *de novo* the denial of a Rule 50(b) motion. *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015). We construe the trial evidence "strictly in favor of the party who prevailed before the jury." *Passananti v. Cook County*, 689 F.3d 655, 659

---

[2] The district judge took a prudent approach by denying summary judgment and allowing the pattern issue to go to the jury. The issue is fairly debatable, and because Judge Kennelly handled the issue so deftly, we need not order a new trial.

[3] The jury also awarded a total of $4 million in punitive damages against Johnston personally, $1 million for each of four plaintiffs. Johnston dismissed his appeal voluntarily after settling with plaintiffs.

(7th Cir. 2012). We look to see whether a reasonable jury would have "a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1); *Lawson*, 791 F.3d at 761.

The statute defines RICO conspiracy by reference to a direct RICO violation. 18 U.S.C. § 1962(d). A direct RICO violation under § 1962(c) requires "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985) (footnote omitted). As with any conspiracy, a RICO conspirator "must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997).

A RICO conspiracy requires proof "that (1) the defendant[s] agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity, and (2) the defendant[s] further agreed that someone would commit at least two predicate acts to accomplish these goals." *Empress Casino III*, 763 F.3d at 734–35 (internal quotation marks and citations omitted; alteration in original). Courts have further fleshed out those requirements. A RICO conspirator need not agree to commit personally two predicate acts in furtherance of the enterprise; rather, he must agree that someone will commit them. *Salinas*, 522 U.S. at 65. And to agree to control or participate in the affairs of an enterprise through a pattern of racketeering activity, one need not agree to "personally participate in the operation or management of the enterprise." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 967 (7th Cir. 2000).

Rather, one must "knowingly agree to perform services of a kind which facilitate the activities of those who are operating the enterprise in an illegal manner." *Id.*

The racetracks argue that a rational jury could not have found from the evidence presented at trial: (1) that they agreed to facilitate a RICO enterprise; (2) that the racetracks made a *quid pro quo* agreement with Blagojevich; (3) that the racetracks agreed that someone would commit two RICO predicate acts; or (4) that the agreed-on scheme would form a pattern of racketeering activity. We address these challenges in turn. The first issue was waived by failure to raise it in the Rule 50 motion. The evidence supports a finding of a *quid pro quo* agreement that extended to at least two predicate acts of racketeering, but that evidence does not support a finding of an agreement to engage in a pattern of racketeering activity.

A. *Facilitating a RICO Enterprise*

The racetracks did not properly preserve for appeal their argument that the evidence did not support a finding that the racetracks agreed to facilitate the Blagojevich racketeering enterprise. To preserve a sufficiency-of-the-evidence challenge for appeal in a civil case, a party must move for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) and renew that motion under Rule 50(b) after the jury's verdict. *Ortiz v. Jordan*, 562 U.S. 180, 189 (2011). In their Rule 50(a) and (b) motions, the racetracks challenged the sufficiency of the evidence on the other grounds we address below. In a footnote in their Rule 50(b) motion, the racetracks did "incorporate by reference" their entire earlier supplemental motion for summary judgment, which included an argument about facilitation. However, the racetracks did not argue in their Rule 50 motions that there was insufficient evidence that they

knowingly facilitated the activities of the racketeering enterprise.

To avoid the Rule 50 problem, the racetracks suggest that we review instead whether the district court erred in denying their supplemental motion for summary judgment. But denial of summary judgment is an interlocutory matter subsumed by a final judgment. Once a jury has rendered its verdict, "the full record developed in court supersedes the record existing at the time of the summary-judgment motion." *Ortiz*, 562 U.S. at 184; see also *Lawson*, 791 F.3d at 761 ("summary judgment relies on evidentiary predictions, which are unnecessary once a jury has found the actual facts"). After trial, the summary judgment denial is ancient history and not subject to appeal.

The racetracks argue that, even after the jury has rendered its verdict, we should review the denial of summary judgment as to purely legal issues. See *Lawson*, 791 F.3d at 761–62 & n.2 (contract interpretation issue was reviewable, but noting circuit split on issue); *Chemetall GmbH v. ZR Energy, Inc.*, 320 F.3d 714, 718–20 (7th Cir. 2003) (same). This controversial exception for purely legal issues does not apply here. The racetracks' argument regarding facilitation challenges the sufficiency of the evidence supporting the jury's verdict, so their failure to raise the argument in Rule 50(a) and (b) motions blocks that particular argument on appeal. See *Brown v. Smith*, No. 15-1114, — F.3d —, —, 2016 WL 3536619, at *3 (7th Cir. June 28, 2016) (factual issue not properly preserved for appellate review after trial absent Rule 50(b) motion).[4]

---

[4] In any event, we are satisfied that there was no independent merit to the racetracks' facilitation argument, based on the evidence of the *quid pro quo* agreement to bribe Blagojevich.

B.  *Quid Pro Quo Agreement*

We proceed to the racetracks' properly preserved challenges to the sufficiency of the evidence supporting the jury's findings of a *quid pro quo* agreement encompassing at least two predicate acts as part of a pattern of racketeering activity.

The racetracks' liability in this case depends on evidence sufficient to enable a jury to find that there was a *quid pro quo* agreement. An agreement forms the core of liability for RICO conspiracy under 18 U.S.C. § 1962(d). See *Salinas*, 522 U.S. at 63–64. A *quid pro quo* agreement to trade a campaign contribution for the governor's signature is the foundation of the casinos' claim for a RICO conspiracy, as well as for their state-law claims for civil conspiracy and unjust enrichment.

The parties presented sufficient evidence at trial to allow a rational jury to find a *quid pro quo* agreement between Johnston and Blagojevich. First, ample evidence shows that Monk and Blagojevich communicated to Johnston that Blagojevich would trade his signature on the 2008 Act for a campaign contribution. Second, the jury could conclude that Johnston agreed to this arrangement on behalf of the racetracks.

The casinos argue that Blagojevich first delivered the message that he was looking for a bribe in an April 2008 meeting. In that meeting, Johnston met with Blagojevich at the governor's campaign fundraising office. Among other things, the two discussed the expiration of the 2006 Act. At the end of the meeting, Blagojevich told Johnston that he appreciated Johnston's past support and hoped he would continue his support in the future. Johnston testified that he did not respond to the comment because he and his father had already decided not to contribute to Blagojevich in 2008. Johnston agreed that he

understood that "what Mr. Blagojevich was looking for in that meeting was a contribution."

We need not decide whether the evidence of that meeting alone provided sufficient evidence to infer an illegal agreement. Soliciting a campaign contribution, even from a constituent pushing an agenda, is legal and "in a very real sense is unavoidable so long as election campaigns are financed by private contributions or expenditures." *McCormick v. United States*, 500 U.S. 257, 272 (1991). Exchanging a campaign contribution for state action, however, is not legal. *Id.* at 272–73. Juxtaposing the discussion of the two topics so closely is dangerous, walking close to the edge of thin legal ice. But the evidence does not show that Johnston agreed to the proposed exchange in that April meeting with Blagojevich.

Later events provide more evidence from which the jury could have found that Johnston agreed to exchange the campaign contribution for the governor's signature sometime in August or September 2008. Sometime in that period, Blagojevich called Johnston. Johnston testified that he received the only phone call he ever received from Blagojevich in August, and he denied that Blagojevich asked him for a $100,000 contribution in that call. But Monk testified that in September 2008, Governor Blagojevich called Johnston and secured a commitment for a $100,000 campaign contribution. A Blagojevich campaign list on September 12, 2008 indicated that Blagojevich expected a $100,000 contribution from Johnston in October. And Monk testified that he had "five or six" conversations with Johnston about the "timing" of Johnston paying the contribution during October and November 2008.

Monk's several calls with Robert and Rod Blagojevich in November 2008 reassuring them that Johnston's contribution

would be forthcoming provide additional evidence that John-
ston had agreed to make the contribution in an unlawful ex-
change for Blagojevich's support for the 2008 Act. For exam-
ple, on November 13, 2008, Robert Blagojevich called Monk,
who reported that Johnston had said to him to "tell the big
guy I'm good for it." Monk reported telling Johnston to "get
it to us as soon as you can." Monk also tied the contribution
to the 2008 Act, at least obliquely, in the conversation with
Robert Blagojevich. He said that he wanted to talk to the gov-
ernor about the timing of the contribution "because there's ab-
solutely no connection between the two but there is a legisla-
tive issue down here that … I don't want to get in the
way … of … ." Monk testified that the "legislative issue" was
the 2008 Act. Still, this evidence was from Monk, not from
Johnston.

But when we add in the evidence of events after the legis-
lature passed the 2008 Act, the jury had a solid basis for infer-
ring that Johnston had agreed to a *quid pro quo* scheme. On
November 24, 2008, the same day the bill was presented to
Blagojevich for his signature, Johnston responded to an email
chain reporting that the governor would likely sign the 2008
Act before mid-December. He wrote to his internal lobbying
team: "This is getting goofier. We are going to have to put a
stronger bit in his mouth!?!" Although Johnston testified to
the contrary, the jury was entitled to disbelieve him and infer
that the "stronger bit" referred to the campaign contribution.

Further evidence of an illegal *quid pro quo* agreement came
from the events of December 3, 2008, when Monk and Rod
Blagojevich met at a Blagojevich campaign office. Govern-
ment tapes captured Monk and Blagojevich discussing what
to tell Johnston about the timing of the bill signing relative to

Johnston's contribution. Monk said: "I wanna go to him without crossing the line and say, give us the f***in' money. … give us the money and one has nothing to do with the other … but give us the f***in' money. Because they're losin', they're losing 9,000 a day. … For every day it's not signed." Monk planned to tell Johnston that he was concerned that Johnston would "get skittish" about the campaign contribution if Blagojevich signed the bill. Monk agreed in his testimony that he understood from that conversation that "Governor Blagojevich was exchanging the signing of the [2008 Act] quickly for that campaign contribution." Monk then called Johnston and arranged to go see him immediately.

Monk initially met with Johnston and Johnston's father, Billy. The three discussed the 2008 Act and the racetracks' eagerness for Blagojevich to sign it. There was no talk of a campaign contribution at that point. After the meeting, Monk asked Johnston to walk him out to the parking lot. On their way out, Monk told Johnston that the governor "has a concern that if he signs the racing legislation, you might not be forthcoming with a contribution." Johnston's account of this encounter shows him as innocent. He testified that he did not react kindly to the suggestion. He said he "flew off the handle a little bit," and told Monk that "your suggestion of a contribution at this time is wrong and inappropriate," due to the apparent tie between the contribution and signing the bill.

But Monk's very different account of Johnston's reaction provides ample evidence from which a jury could find that Johnston had agreed to the *quid pro quo* arrangement. Later that day, Monk called Blagojevich to report the result of the meeting with Johnston. Monk reported that Johnston said he would make the contribution within two weeks. Monk also

relayed that Johnston had offered to put off part of the contribution into the next quarter in response to Monk voicing concerns that Johnston might get "skittish" if Blagojevich signed the bill. Monk declined that offer. At trial, Monk testified that what he had told Blagojevich about the conversation with Johnston was accurate. Monk's testimony about the December 3 conversation with Johnston gave the jury sufficent evidence that Blagojevich had proposed a *quid pro quo* exchange and that Johnston had agreed to it.

The racetracks point out correctly that Monk and Johnston both testified that there was no "agreement." For example, Monk testified about the December 3 meeting: "I thought he was going to make a donation. I don't think we had an agreement." But it is easy to read this disclaimer as a merely semantic argument by experienced operatives who know that an agreement is a crime. Monk agreed in his testimony that the "message" he intended to deliver on December 3 was "that once the hundred thousand dollar contribution was made, the 2008 Racing Act would be signed." That is a *quid pro quo* agreement. Johnston also confirmed in his testimony that he knew "Mr. Blagojevich was looking for a contribution before the bill would be signed." And Monk testified that Johnston had reassured him that he would make the contribution.

Monk and Johnston did not have to use the word "agreement" in their testimony to allow a jury to find a *quid pro quo* agreement. The jury was entitled to put two and two together. See *United States v. Blagojevich*, 794 F.3d 729, 738 (7th Cir. 2015) ("Few politicians say, on or off the record, 'I will exchange official act X for payment Y.' Similarly persons who conspire to rob banks or distribute drugs do not propose or sign contracts in the statutory language."). The evidence, viewed in the light

most favorable to the casinos, allowed the jury to find that Blagojevich conditioned his quick signature on the 2008 Act on Johnston's campaign contribution, that Monk communicated that to Johnston, and that Johnston agreed to that arrangement. The evidence supported the jury's finding of a *quid pro quo* agreement.[5]

C. *Two Predicate Acts*

The racetracks next challenge the sufficiency of evidence that they agreed to the commission of two RICO predicate acts. Liability for a § 1962(c) RICO conspiracy requires an agreement that someone conduct an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(c), (d); *Salinas v. United States*, 522 U.S. 52, 65–66 (1997). Racketeering activity is defined to include any of a long list of crimes. 18 U.S.C. § 1961(1). A pattern of racketeering activity requires two or more predicate acts. 18 U.S.C. § 1961(5). For the sake of clarity, we analyze the two-predicate-acts requirement in this section and whether those predicate acts were enough to form a pattern in the next section.

A rational jury could find that Johnston committed or agreed to the commission of several RICO predicate acts. Johnston's agreement to bribe Blagojevich would count. See 18 U.S.C. §§ 1951(b)(2), 1961(1); 720 ILCS 5/33-1; see *Evans v. United States*, 504 U.S. 255, 260–61 (1992) (Hobbs Act extortion

---

[5] To whatever extent the racetracks seek a new trial on the theory that the manifest weight of the evidence was that there was no *quid pro quo* agreement, we reject that request for the reasons stated in this section. See *Whitehead v. Bond*, 680 F.3d 919, 928–29 (7th Cir. 2012) (discussing legal standard for granting new trial because a verdict was against the manifest weight of the evidence).

encompasses "taking a bribe"). And agreeing that Blagojevich would commit official misconduct by signing the bill in exchange for a bribe was also an agreed-upon predicate act. See 18 U.S.C. § 1961(1)(A); 720 ILCS 5/33-3(a)(4).

"Honest services" wire fraud is also a RICO predicate. See 18 U.S.C. §§ 1343, 1346, 1961(1)(B). Each use of the wires, such as a cellphone call, to arrange the bribe would count, as long as Johnston agreed to it or it was foreseeable in carrying out his agreement. See *Skilling v. United States*, 561 U.S. 358, 405–08 (2010) (bribery is at the core of "honest services" wire fraud); see also *United States v. Sheneman*, 682 F.3d 623, 630 (7th Cir. 2012) (foreseeable use of wires is crime even if not actually intended by defendant); *United States v. Radomski*, 473 F.3d 728, 729 (7th Cir. 2007) ("cellphone to cellphone conversations involve communications over wires at some point in the transmission"). Using the wires for lobbying and political log-rolling is not honest services wire fraud, but arranging and paying a *quid pro quo* bribe certainly is. See *Blagojevich*, 794 F.3d at 736. It is also possible that the casinos' daily tax payments might have counted as honest services wire fraud. See *Sheneman*, 682 F.3d at 629–30 ("Moreover, it is not necessary for the use of the wires to contain any false or fraudulent material, and even a routine or innocent use of the wires may satisfy this element so long as that use is part of the execution of the scheme.").

Each use of the wires can be an individual count of wire fraud and an individual RICO predicate for the purpose of establishing two predicate acts. See, e.g., *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024–25 (7th Cir. 1992); see also *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001) ("each use of the wires constitutes a separate violation of 18 U.S.C. § 1343").

The jury rationally could have found that Johnston agreed to a bribery scheme that would foreseeably include at least two acts of racketeering.

### D. *Pattern of Racketeering Activity*

The casinos run into trouble, however, in showing that the parties agreed to predicate acts forming a pattern of racketeering activity. RICO provides that a "pattern of racketeering activity requires at least two acts of racketeering activity," 18 U.S.C. § 1961(5), but case law shows that two predicate acts are not always sufficient. *H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 237 (1989). To form a pattern, the predicate acts must exhibit "continuity plus relationship." *Id.* at 239 (citation and internal quotation marks omitted; emphasis removed). Related predicate acts have "the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240 (citation and internal quotation marks omitted). The predicate acts' relationship is not disputed here. Our focus is on continuity.

Continuity is "centrally a temporal concept." *Id.* at 242. The continuity requirement ensures that RICO targets "long-term criminal conduct," one classic example being a protection racket, in which a criminal extracts monthly "insurance" payments from businesses. *Id.*; see also *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006) ("RICO, nonetheless, does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity."). Continuity limits RICO to schemes meant to exist over a period of time, not one-off crimes.

The Supreme Court has divided continuity into two analytical types: "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241. Here, the agreed predicate acts lacked the requisite continuity to form a pattern under either analysis.

### 1.  *Closed-End Continuity*

The racetracks' scheme does not exhibit closed-end continuity, and the casinos admit that they did not rely at trial on a closed-end argument. Closed-end continuity is satisfied by "a series of related predicates extending over a substantial period of time." *H.J. Inc.*, 492 U.S. at 242. To determine closed-end continuity, we examine "the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986); see also *Vicom, Inc. v. Harbridge Merchant Services, Inc.*, 20 F.3d 771, 780 (7th Cir. 1994). Here, the arrangements for the bribe began no earlier than the April 2008 meeting about the bill at the Friends of Blagojevich office and ended in December 2008, when Blagojevich signed the bill. One *quid pro quo* agreement, one planned campaign contribution for one bill, one tax imposed, and acts over at most eight months to arrange the scheme do not show closed-end continuity. See, e.g., *Vicom, Inc.*, 20 F.3d at 780 (nine-month-long scheme insufficient for closed-end continuity); *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1024 (7th Cir. 1992) (same). The three-percent tax was

also time-limited and does not provide the type of distinct in-
juries or variety of predicate acts that would form closed-end
continuity. See *Vicom, Inc.*, 20 F.3d at 781–82.

2. *Open-Ended Continuity*

The casinos rely instead on a theory of open-ended conti-
nuity and the "*threat* of continuity." *H.J. Inc.*, 492 U.S. at 242
(emphasis in original). Open-ended continuity is satisfied by
"past conduct that by its nature projects into the future with
a threat of repetition." *Id.* at 241. Our circuit has noted three
situations that satisfy open-ended continuity: "when (1) 'a
specific threat of repetition' exists, (2) 'the predicates are a reg-
ular way of conducting [an] ongoing legitimate business,' or
(3) 'the predicates can be attributed to a defendant operating
as part of a long-term association that exists for criminal pur-
poses.'" *Vicom, Inc.*, 20 F.3d at 782 (alteration in original), quot-
ing *H.J. Inc.*, 492 U.S. at 242–43.

The evidence here does not demonstrate a threat of repe-
tition. This case is about one *quid pro quo* agreement to ex-
change one campaign contribution for Blagojevich's signature
on one bill. Once Blagojevich signed the bill, the scheme was
over. After we affirmed summary judgment on claims regard-
ing the 2006 Act, the evidence of bribery in this trial related
only to the 2008 Act. See *Empress Casino III*, 763 F.3d at 731
("Evidence is similarly lacking to support a finding that the
Racetracks bribed Governor Blagojevich to sign the '06 Act
into law.").

We have repeatedly held that schemes fail to satisfy open-
ended continuity where they have a "natural ending point."
In *Roger Whitmore's Automotive Services, Inc. v. Lake County*, we
affirmed summary judgment for defendants on RICO claims

alleging that the Lake County Sheriff had cut a towing company's assigned towing area because the owner had supported the sheriff's opponent in an election. 424 F.3d 659, 665–66 (7th Cir. 2005). We rejected open-ended continuity because all of the predicate acts alleged related to campaign fundraising from the 1998 election campaign. "[T]he alleged scheme had a natural ending point when Del Re was elected sheriff and he retired the debt accrued in that campaign." *Id.* at 674.

We have applied this logic in other cases involving similarly limited criminal schemes. See, e.g., *Gamboa v. Velez*, 457 F.3d 703, 708 (7th Cir. 2006) (holding on pleadings that alleged scheme to frame murder suspect did not satisfy continuity because scheme was "a one-time endeavor to wreak havoc upon all matters linked to a single murder investigation" that "had a built-in end point: once the frame-up was put to rest, the scheme was over"); *Vicom, Inc.*, 20 F.3d at 783 (affirming dismissal on pleadings; no open-ended continuity because fraudulent scheme to inflate company's value in the eyes of prospective purchaser "had a natural ending point" with company's sale); *Uni\*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 919–920, 922 (7th Cir. 1992) (affirming dismissal on pleadings; scheme not to pay for software project did not satisfy continuity because it had a "natural end point: the completion of the [project]").

In *Roeder v. Alpha Industries, Inc.*, the First Circuit applied this reasoning to affirm a district court's Rule 12(b)(6) dismissal of a similar RICO claim involving a one-time bribe. 814 F.2d 22, 23 (1st Cir. 1987). The plaintiff alleged that Alpha Industries had bribed an employee of another company so that Alpha would be included as a subcontractor in a defense contract. *Id.* Alpha paid the bribe in three installments, and there

were eleven phone calls and eight letters associated with it. *Id.* at 31. The First Circuit reasoned: "A bribe, which by any realistic appraisal is solitary and isolated, is not transformed into the threatening 'pattern of racketeering activity' with which Congress was concerned simply because the bribe is implemented in several steps and involves a number of acts of communication." *Id.* Although the First Circuit decided *Roeder* before *H.J. Inc.*, in which the Supreme Court developed the continuity analysis framework, *Roeder*'s reasoning is consistent with *H.J. Inc.* and applies directly here.

In contrast, schemes exhibiting open-ended continuity are not "inherently terminable." See *Heinrich v. Waiting Angels Adoption Services, Inc.*, 668 F.3d 393, 400, 410–11 (6th Cir. 2012) (noting that in fraudulent adoption scheme "there is no inherent limit to the number of couples seeking to adopt or to the number of children that the defendants could hold out as available for adoption"). RICO does not require more than one scheme, *H.J. Inc.*, 492 U.S. at 240, but a scheme must include some threat of continuing into the future to satisfy open-ended continuity.

Applying the reasoning from these cases to the Blagojevich-Monk-Johnston bribery agreement in 2008, a reasonable jury could not have found a scheme with open-ended continuity. No specific threat of repetition existed. Once the bill was signed, the scheme was at its natural end point, at least on the evidence presented at trial. The tax payments under the 2008 Act, of course, continued for a limited time after the bill's signing, but that is not enough to support open-ended continuity. See *Vicom, Inc.*, 20 F.3d at 781 ("Mail fraud and wire fraud are perhaps unique among the various sorts

of 'racketeering activity' possible under RICO in that the existence of a multiplicity of predicate acts … may be no indication of the requisite continuity of the underlying fraudulent activity.") (alteration in original), quoting *Lipin Enterprises Inc. v. Lee*, 803 F.2d 322, 325 (7th Cir. 1986) (Cudahy, J., concurring).

The casinos argue that they satisfied the continuity requirement based on the possibility that the racetracks would again employ bribery when the 2008 Act was scheduled to sunset in 2011. In denying the racetracks' Rule 50(b) motion, the district court adopted this theory, noting that the jury could have found a threat of repetition from evidence that "the 2008 Act included a sunset provision, and Johnston and other members of the horse racing industry considered what would happen when the Act expired in 2011 … along with the testimony that Blagojevich regularly traded state action for campaign contributions … ." Such suspicions are understandable but are too close to speculative to support a finding of continuity. There would be a gubernatorial election in 2010. No one in 2008 could know who would be governor in 2011, much less whether illegal tactics would be needed or even welcome in securing reenactment in 2011.

The evidence regarding the racetracks' consideration of the 2008 Act's sunset provision does not show any plans to use illegal means to secure renewal. The racetracks rely on a September 2008 email exchange. The email exchange shows the racetracks planning to have the 2008 Act run for a longer period so that they could get a replacement act passed before the 2008 Act expired. Those emails are about the minutiae of drafting the 2008 Act, not a criminal scheme for getting a future bill enacted. The email chain opened with this message: "Draft of extension bill amendment. We will need to change

page 5, line 10 to reflect repeal effective 3 years after effective date of law." The reply email said: "We should just make it the end of 2011 so we don't have the possibility of it falling through the cracks. Similar to what happened when [the 2006 Act] expired on May 24th and we were still trying to get the extension passed at the end of May. In 2011 the veto session could end up being later than three years after the effective date. Then again, that would be a nice problem to have to worry about." That message was forwarded with a message reading: "See Jack's comments below, with which I agree. Jack are you having [redacted] review the findings to add anything in finding 5? [When we hear] from you we will have Andrea redraft to fix this expiration problem." Jack replied: "Yes. I need to give him a call to discuss."

In their closing argument, the casinos told the jury that these emails showed that "this pattern is going to happen again, and it would have but for" the government arresting and prosecuting Blagojevich. We are not convinced this is a reasonable reading of this email chain. The emails reflect the racetracks' awareness that new legislation would be needed in the future and their intent to pursue it. But that is all the emails show. There is no indication that the racetracks considered how to get the later act through the legislature or how to get the governor to sign it, let alone that they were planning or even contemplating another bribe to an as-yet-unknowable governor or legislators.

The evidence certainly shows that Blagojevich's regular way of conducting business involved bribery. And Johnston knew about the criminal investigation into Blagojevich by late 2007. But Blagojevich is not the defendant here. The question is the scope of what Johnston and the racetracks agreed to.

Monk and Johnston both testified that Johnston was not aware of the various other Blagojevich schemes mentioned at trial. Johnston and the racetracks' liability for RICO conspiracy cannot be based on "mere association with an enterprise." *Brouwer v. Raffensperger, Hughes & Co.*, 199 F.3d 961, 965–66 (7th Cir. 2000). The standard, rather, is whether *these defendants agreed* that someone would commit two predicate acts and whether *these defendants agreed* "to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity." *Empress Casino III*, 763 F.3d at 734–35 (citations and internal quotation marks omitted). There is no evidence that Johnston agreed to participate in any corrupt scheme except for the one to have Blagojevich sign the 2008 Act. A one-time bribe to a corrupt public official is criminal and wrong, but without more it is not enough to prove a pattern of racketeering activity.

This case contrasts with *H.J. Inc.*, for example, where plaintiffs alleged a six-year scheme where defendants "with some frequency" bribed public utility commissioners to approve unreasonable rates. 492 U.S. at 250. Those plaintiffs could have shown open-ended continuity because "the alleged bribes were a regular way of conducting [defendant's] ongoing business, or a regular way of conducting or participating in the conduct of the alleged and ongoing RICO enterprise, the [utility commission]." *Id.* Here, the evidence of unlawful activity related to only the 2008 Act. The casinos did not present evidence that would allow a reasonable jury to find that the racetracks agreed to conduct their business regularly through *quid pro quo* bribery or agreed to participate regularly in Blagojevich's larger corrupt scheme through bribery, or that there was a threat of such activity.

It is, of course, possible that the racetracks might have tried to use bribery again in 2011, if Blagojevich had not been removed from office and had run successfully for a third term. That speculative possibility is not enough to support the jury finding of a conspiracy to engage in a RICO pattern of racketeering activity. Rather, the evidence shows a scheme with a "natural ending point." Blagojevich signed the 2008 Act into law. There is insufficient evidence to support a jury finding of a pattern of racketeering activity, so we reverse the district court's denial of the racetracks' Rule 50(b) renewed motion for judgment as a matter of law on this issue.

III. *Leave to Amend*

We next address the racetracks' claim that the district court abused its discretion by allowing the casinos to add state-law claims for civil conspiracy and unjust enrichment to their complaint after we affirmed summary judgment regarding the 2006 Act but let claims regarding the 2008 Act move forward. Leave to amend pleadings is left to the sound discretion of the district court. *McCoy v. Iberdrola Renewables, Inc.*, 760 F.3d 674, 684 (7th Cir. 2014); *Trustmark Insurance Co. v. General & Cologne Life Re of America*, 424 F.3d 542, 553 (7th Cir. 2005). Because the casinos sought to amend their complaint after the deadline set by the district court's original scheduling order, Federal Rule of Civil Procedure 16(b)(4) required them to show good cause for amendment, a standard that "primarily considers the diligence of the party seeking amendment." *Trustmark Insurance*, 424 F.3d at 553 (citation and internal quotation marks omitted).

We find no abuse of discretion here. The amendment was a prompt response to the altered landscape of the case after we affirmed summary judgment on the 2006 Act claims but

allowed the 2008 Act claims to go forward. We issued our rul-
ing on summary judgment on August 15, 2014, in which we
signaled there might well be a problem in showing a pattern
based on only the 2008 Act. *Empress Casino III*, 763 F.3d at 735.
The casinos moved for leave to amend their complaint on Oc-
tober 2, 2014.

We regularly affirm district courts' decisions to deny un-
duly delayed requests to amend pleadings. See, e.g., *McCoy*,
760 F.3d at 687 (affirming district court denial, under Rule 15,
of leave to amend counterclaims six months after original
counterclaims had been dismissed, noting "the unexplained
delay looks more like procedural gamesmanship than legiti-
mate ignorance or oversight"). But affirming discretionary *de-
nial* of leave to amend does not suggest that we would also
hold that a court would have abused its discretion in *granting*
leave to amend, even in similar circumstances. In their appel-
late briefing on amendment issue, the racetracks have not
cited a case in which we reversed a district court's exercise of
discretion to grant leave to amend. Such cases are exceedingly
rare. Cf. *Venters v. City of Delphi*, 123 F.3d 956, 969 (7th Cir.
1997) (reversing district court's decision to consider statute of
limitations defense never asserted in pleading and first raised
in reply brief on summary judgment).

With a late motion for leave to amend, the "underlying
concern is the prejudice to the defendant rather than simple
passage of time." *McCoy*, 760 F.3d at 687. As the district court
held, since the new state-law claims relied on the same facts
as the RICO claim, the amendments did not unfairly prejudice
the racetracks. Both state-law theories, civil conspiracy and
unjust enrichment, depended on the *quid pro quo* agreement

between Blagojevich and Johnston, brokered by Monk. The Illinois civil conspiracy claim was based on the agreement between Johnston and Blagojevich. See *Fritz v. Johnston*, 807 N.E.2d 461, 470 (Ill. 2004) (defining elements of civil conspiracy). Unjust enrichment under Illinois law requires a plaintiff to show that a defendant has "unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). Here, the unjust benefits were the payments received as a result of the agreed bribe to sign the 2008 Act.

The racetracks argue that the additional claims unfairly prejudiced them because they were unable to conduct sufficient discovery on a potential unclean hands defense to the unjust enrichment claim. We are not persuaded. The district court enforced many of the racetracks' document and deposition requests related to the casinos' lobbying on the 2006 and 2008 Acts. For example, the court enforced the racetracks' motion to compel production of documents "evincing any communications" between the casinos and legislators or the governor "relating to the Racing Acts." The court also required production of "documents sufficient to show all contributions made to Mr. Blagojevich or to members of or candidates for the Illinois General Assembly between 2005 and 2008." The court also enforced a Rule 30(b)(6) deposition notice regarding all "communications between [Plaintiff] and any member of the Illinois General Assembly regarding … the 2006 and 2008 Racing Acts … ." Although the court did not enforce every discovery request the racetracks made, they still conducted substantial discovery into the casinos' political activities. The racetracks have not demonstrated unfair prejudice

here such that we could conclude that the district court abused its discretion in granting leave to amend.[6]

## IV. *Claims of Trial Error*

The racetracks also appeal the denial of their Rule 59 motion for a new trial based on several alleged trial errors. We review the denial of a Rule 59 motion for a new trial for an abuse of discretion. *Davis v. Wisconsin Dep't of Corrections*, 445 F.3d 971, 979 (7th Cir. 2006). An appellate court will order a new trial in a civil case "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* (citation and internal quotation marks omitted). We find no abuse of discretion in the district court's conclusion that the alleged errors do not warrant a new trial. We examine the claims of error in turn.

### A.  *Evidence of 2002–2007 Campaign Contributions*

The racetracks argue that the district court erred by admitting evidence of their contributions to Rod Blagojevich from

---

[6] The racetracks argue on appeal that leave to amend unfairly prejudiced them because it introduced the possibility of punitive damages into the case. The racetracks did not make this argument to the district court, so it is forfeited. Even if it were not forfeited, it is unconvincing. First, this was a civil RICO case in which the defendants already faced the threat of treble damages under 18 U.S.C. §1964(c). Also, the racetracks cite cases affirming denials of leave to amend to add punitive damage claims. See *Knapp v. Whitaker*, 757 F.2d 827, 849 (7th Cir. 1985); *Orix Credit Alliance, Inc. v. Taylor Machine Works, Inc.*, 125 F.3d 468, 481 (7th Cir. 1997); *Hartis v. Chicago Title Ins. Co.*, 694 F.3d 935, 948–49 (8th Cir. 2012). A late attempt to add punitive damages might give a district court a sound basis to deny leave to amend, at least if RICO trebling were not already in the case, but that would not mean the court lacked discretion to allow the amendment.

2002 to 2007 and also erred by not instructing the jury that those contributions were legal. We review the district court's decision to admit the evidence of the 2002 to 2007 contributions to Blagojevich for abuse of discretion. *Geitz v. Lindsey*, 893 F.2d 148, 150 (7th Cir. 1990). We find none here.

The district court's ruling on the racetracks' motion *in limine* admitted evidence of the 2002 to 2007 contributions because the evidence "tends to support the notion that [Johnston] would have agreed to make a significant contribution in 2008 and that Blagojevich and his agents would have sought a significant contribution from Johnston at that time." The evidence at trial confirmed the district court's theory of relevance. In one recorded telephone conversation, Monk reported that Johnston said he was not worried about the promised contribution because he had "a history of giving these amounts … ." The history of contributions also gave context to Blagojevich's statement at the April 2008 meeting that he appreciated Johnston's past support and would appreciate more.

The district court did not abuse its discretion by declining to exclude the contributions as "propensity" evidence under Federal Rule of Evidence 404(b)(1). It is hard to see why the casinos would be using the racetracks' past *legal* contributions to Blagojevich to prove the racetracks' "propensity to behave in a certain way," as Rule 404(b)(1) prohibits. See *United States v. Gomez*, 763 F.3d 845, 855 (7th Cir. 2014) (en banc). The casinos were trying to prove the opposite of a legal contribution. Rather, it makes more sense that the past legal contributions were used to show "opportunity" to engage in an illegal *quid pro quo* scheme. See Fed. R. Evid. 404(b)(2). Consistent with that reasoning, the district court limited the contributions' use

to showing that the racetracks "had a regular practice of making significant contributions to Rod Blagojevich's campaigns" and "as support for the proposition that Blagojevich would have sought a significant contribution from Johnston in 2008."

The evidence of the contributions also was not so unfairly prejudicial in linking the racetracks to Blagojevich that the evidence should have been kept out under Federal Rule of Evidence 403. Plenty of other evidence linked Johnston and Blagojevich, some of it in much more damning fashion. And evidence of the earlier contributions was not entirely harmful to the racetracks: on the stand, Johnston himself brought up his contribution to Blagojevich from 2002 and 2006 in response to questions about media reports in 2008 that an unnamed racetrack executive had promised Blagojevich a $100,000 contribution for the governor's signature on legislation. The district court also gave a proper limiting instruction, which would have mitigated any risk of unfair prejudice. Absent indications to the contrary, we presume that juries heed limiting instructions. *United States v. Mallett*, 496 F.3d 798, 802 (7th Cir. 2007).

We also disagree with the racetracks that the district court erred by refusing to instruct the jury that the 2002 to 2007 contributions were legal and not bribes. The judge actually instructed the jury: "You have heard evidence that the defendants made campaign contributions to Friends of Blagojevich in the years 2002 through 2007. It is common for citizens and corporations to donate to political campaigns, and there is nothing illegal about this practice." This instruction was a little weaker than the instruction the court was originally planning to give, which would have said that the 2002 to 2007 con-

tributions "were legal campaign contributions." We are confi-
dent, though, that the jury would not have been confused
about the legality of the 2002 to 2007 contributions. The dis-
trict court did not abuse its discretion in wording the instruc-
tion as it did.[7]

B. *The Fifth Amendment and the Adverse Inference Instruc-
tion*

The government's letter offering Johnston immunity from
prosecution in exchange for information on Blagojevich said:
"Your attorney has represented that such information may
tend to incriminate you." The judge instructed the jury: "In a
civil case like this one, you may infer that Mr. Johnston had
information that would have incriminated him. You are not
required to draw this inference." The racetracks argue that the
district court erred by giving this instruction. They point out
that Johnston testified before the grand jury and in the Blago-
jevich trials, albeit subject to immunity, and assert that he an-
swered every question in this case.[8]

---

[7] To the extent the casinos also complain about evidence of Johnston's con-
tributions to former Illinois Governor Jim Edgar, the district court did not
abuse its discretion in finding that the racetracks had opened the door to
that evidence by attempting to minimize their contributions to Blago-
jevich.

[8] In this trial, Johnston first testified that he had told the government what
he knew before receiving immunity from prosecution. As Johnston's law-
yers admitted the next morning, that was incorrect. First Johnston re-
ceived his immunity letter. Only then did he answer the government's
questions. Johnston's lawyers agreed that he would correct this misstate-
ment in his later testimony. Yet on redirect examination by the casinos'
lawyer, Johnston still stuck to his false story from the previous day. Fi-
nally, after still more questioning, Johnston admitted that he had signed

"We review a district court's choice of jury instruction de novo when the underlying assignment of error implicates a question of law …; however, general attacks on jury instructions are reviewed for an abuse of discretion." *United States v. Macedo*, 406 F.3d 778, 787 (7th Cir. 2005); see also *United States v. Tavarez*, 626 F.3d 902, 904 (7th Cir. 2010).

The district court did not abuse its discretion in giving the adverse inference instruction, which was legally accurate and permissible. The Fifth Amendment allows adverse inference instructions against parties in civil actions. *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976). The instruction here did not tell the jury to give Johnston's silence "more evidentiary value than was warranted by the facts surrounding his case." *Id.* at 318. Johnston told the jury that he testified before a grand jury and at both of Blagojevich's trials and never refused to answer a question. He also testified that he had told the jury the same story about the events of December 3, 2008 that he had testified to in the Blagojevich trials and that he did not believe any of his testimony incriminated him. Johnston's counsel argued to the jury that Johnston had disclosed everything to the government and that there were no adverse inferences to be made.

Reversing course and testifying after invoking the Fifth Amendment privilege does not remove the relevance of a witness's prior silence as one piece of evidence a jury may consider. See *Harris v. City of Chicago*, 266 F.3d 750, 755 (7th Cir. 2001) (abuse of discretion to bar evidence of prior invocation of Fifth Amendment right by defendant who later waived the

---

the immunity letter before answering questions. This sequence could not have reflected well on Johnston's credibility with the jury.

right and testified at trial); cf. *Evans v. City of Chicago*, 513 F.3d 735, 745 (7th Cir. 2008) (no abuse of discretion in excluding evidence of prior invocation of Fifth Amendment while also allowing defendants who had previously invoked Fifth Amendment to testify, because judge allowed further discovery after defendants elected to testify, although it was a "close call"). Johnston's credibility was at the core of this trial. The jury had to choose between competing accounts from Monk and Johnston. The jury could properly consider Johnston's invocation of his Fifth Amendment rights and his delay in answering questions. For example, it would not have been unreasonable to view his initial refusal to answer questions as a tactic to get his story straight before doing so, and his reluctance to be candid about the timing adds support for that interpretation.[9]

## C. *Exclusion of Victim Impact Letter*

The racetracks offered as evidence a victim impact letter the U.S. government sent to Johnston in connection with Blagojevich's criminal case. The form letter told Johnston that the "judge is interested in knowing the impact this crime has

---

[9] The racetracks point to the Ninth Circuit's statement in *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1265 (9th Cir. 2000), that "no negative inference can be drawn against a civil litigant's assertion of his privilege against self-incrimination unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information." The circumstances in *Doe* were very different from this case, and the Ninth Circuit also noted that the propriety of an adverse inference instruction had to be judged "on a case-by-case basis under the microscope of the circumstances of that particular civil litigation." *Id.* at 1265. The district judge here did so and did not abuse his discretion by giving the adverse-inference instruction.

had on you and your family," and solicited a Victim Impact Statement.

The district court excluded the letter because the "only conceivable purpose" for admitting it would have been to show that the government viewed Johnston as a victim. We find no abuse of discretion. The district court was correct that the letter, if offered to prove that Johnston was a victim rather than a participant, is hearsay, and it had minimal probative value. Using the letter to prove that Johnston was a victim would be using an out-of-court statement for the truth of the matter asserted.

The fact that the government included Johnston, perhaps just to ensure it did not leave anyone out, in its efforts to comply with the Crime Victims' Rights Act, 18 U.S.C. § 3771, also offers no evidence of probative value. Imagine an effort to get around the hearsay problem by calling a prosecutor to testify in the civil case. The racetracks' lawyers would have asked her whether she believed Johnston was a victim or a participant. Her answer would have been an opinion, and it would have been based on a set of information different from what the civil jury would hear. Any fair response to an opinion in either direction would quickly devolve into an argumentative examination that would almost certainly generate more heat than light. This would not have been a useful contribution to the trial. In contrast, Johnston's immunity letter was both specific to Johnston and relevant to his actions, as discussed above.

D. *Damages Argument*

Finally, the racetracks tried to argue in closing that Illinois's "60-day" rule mitigated the damages caused by their

planned bribery of Blagojevich. Under the Illinois Constitution, Art. 4 § 9(b), a bill passed by the General Assembly that the governor does not veto becomes law 60 days after it is presented to the governor. The racetracks wanted to argue that they should be liable, at most, for the taxes levied in the days between the day Blagojevich signed the 2008 Act and the day the bill would have become law anyway under the 60-day rule. The judge sustained the casinos' objection because the argument was contrary to the jury instructions.

The district judge did not abuse his discretion in not allowing a closing argument contrary to the jury instructions. "Broad discretion is reposed in the trial court to control closing arguments and its discretion in this area will not be overturned absent a showing of clear abuse." *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015), quoting *United States v. Grabiec*, 563 F.2d 313, 319 (7th Cir. 1977). The instructions allowed the jury to consider the 60-day rule with regard to the racetracks' motives. "With regard to causation," the jury instructions read, "this evidence does not matter. The defendants may be held liable for any injury proximately caused by the alleged agreement to pay a bribe to Governor Blagojevich regardless of any events that could have happened in the future." And the district court instructed the jury that damages should be "the amount of money that will fairly compensate plaintiffs for any loss to their business or property that you find was *proximately caused* by" the racetracks' unlawful actions (emphasis added).

The district court was on solid ground here because the racetracks never mentioned using the 60-day rule in relation to damages in the argument surrounding the 60-day rule's admissibility. Before trial, the racetracks argued that the 60-day

rule was relevant to whether the casinos had carried their burden of showing proximate cause. When that argument did not work, they argued it was relevant to their lack of motivation to bribe Blagojevich. They never mentioned damages. The district court's ruling on the motions *in limine* admitted evidence of the 60-day rule on a "motive theory of relevance," and on the condition that the racetracks make an offer of proof that they were aware of the rule at the relevant time.

The racetracks now deny that their appellate argument is a challenge to the district court's jury instruction on proximate cause. They assert that their argument related only to damages stemming from Blagojevich's signature of the 2008 Act, not whether the racetracks' actions caused Blagojevich to sign the 2008 Act. The racetracks argue that the casinos' injury is easily divisible so that the damages argument does not contradict our previous rejection of the 60-day rule as a bar to proving proximate causation, which the district court cited in its ruling on the motions *in limine*. See *Empress Casino III*, 763 F.3d at 733 ("the Racetracks may be 'jointly and severally liable for any indivisible injury legally caused by [their] tortious conduct,' regardless of innocent alternative causes") (alteration in original), quoting Restatement (Third) of Torts: Apportionment of Liability § 12.

Perhaps these might have been good arguments to make to the district court before trial or while hammering out jury instructions. As the district court pointed out, though, "at no point did defendants suggest that even if the Court accepted the plaintiffs' proposed proximate cause definition as to liability, a different instruction was warranted for damages." The district court did not abuse its discretion in disallowing

at closing a surprise use of evidence that contradicted the jury instructions.

*   *   *

To sum up, we affirm the decisions and judgment of the district court in all respects except one: the jury did not have a legally sufficient basis in the evidence to allow them to find that there was a pattern of racketeering activity. Accordingly, we AFFIRM the district court's denial of the Rule 59 motion for a new trial, REVERSE the district court's denial of the racetracks' Rule 50(b) renewed motion for judgment as a matter of law as to the RICO count, and REMAND this case for entry of a modified judgment consistent with this opinion. The plaintiff casinos remain entitled to the $25,940,000 in damages for the state-law claims, but they are not entitled to have those damages trebled under RICO.